UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER TODD WILLIAMS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>LAWRENCE LIVERMORE NATIONAL SECURITY, LLC, et al.,<br><br>　　　　Defendants. | Case No. 20-cv-03510-JCS<br><br>**ORDER REGARDING MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO EXCLUDE EXPERT TESTIMONY**<br><br>Re: Dkt. Nos. 96, 100, 109 |

## I.　INTRODUCTION

Plaintiff Peter Todd Williams, Ph.D., pro se, brings a retaliation claim under the False Claims Act ("FCA") against his former employer, Lawrence Livermore National Security, LLC ("LLNS"). LLNS now moves for summary judgment. The Court finds the matter suitable for resolution without oral argument, and VACATES the hearing and case management conference previously set for January 6, 2023. For the reasons discussed below, LLNS's motion is GRANTED.

This order rests on the Court's holdings that Williams has not presented evidence that he subjectively believed LLNS was potentially defrauding the government before he was fired, nor evidence that LLNS knew he was pursuing such a theory. Both parties have moved to exclude their opponent's expert witness opinions on whether a reasonable employee in Williams's position would have believed other LLNS scientists were engaged in fraud on the government. *See* dkts. 96, 109. Since this order does not resolve that question, the expert testimony at issue is not relevant to the outcome of the motion. Both motions to exclude are therefore DENIED as moot.

The Clerk shall enter judgment in favor of LLNS and close the case.[1]

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

## II. BACKGROUND

### A. Factual Overview

The Court's holding in this order is narrow, and this section is intended to summarize evidence relevant to that holding or otherwise useful as context. It is not intended as a comprehensive recitation of the evidentiary record.

LLNS operates the Lawrence Livermore National Laboratory for the U.S. Department of Energy. Williams worked as design physicist for LLNS from January of 2016 until he was fired in May of 2017. *See* Grove Decl. (dkt. 101) Ex. 3 (Williams Dep.) at 50:24–51:3. He was a probationary employee throughout his tenure and lacked access to classified information that was relevant to some of LLNS's work. *Id.* at 51:4–52:3. The nature of his assignments was not always clear to him, and at least some projects were intended to allow him to practice using LLNS's programs and models and to familiarize himself with literature pertaining to specialized areas of physics that he had not worked with previously. *Id.* at 138:8–143:5. Among other projects, he worked on modeling the corner-turning properties of high explosives, which he was led to believe was highly relevant to designing the W80-4 nuclear weapon. Williams Decl. (dkt. 121-1) ¶ 2. During the course of his employment, he discovered that the model produced by another LLNS scientist, Dr. Peter Vitello, rested on a jagged rate curve built with a large number of parameters in a way that Williams believed was unscientific and not supported by experimental results.

Williams testified at his deposition that he first raised concerns about Vitello's models over the course of several conversations with a mentor at LLNS, Dr. Thomas Lorenz, beginning around April or May of 2016. Grove Decl. Ex. 3 (Williams Dep.) at 237:1–238:3. He did not "specifically use[] the word fraud," but "expressed extreme concern" about the methodology at issue. *Id.* at 237:12–17. Williams identified the "crazy rate curve" and raised questions of why the underlying methodology was not being presented, why Vitello only discussed "the good fits," and why the model was used at all. *Id.* at 240:16–25. According to Williams, Lorenz was shocked by what he shared, and concerned about cherry-picking data. *Id.* at 242:16–25. Williams states that the word "waste" was "probably" used during their conversations. *Id.* at 246:17–18.

Williams was not aware of the FCA at the time, only "that it was expected of [him] to conduct good science." *Id.* at 245:2–16. He became aware of the FCA at some point after he was fired. *Id.* at 245:17–246:5.

At a meeting with Vitello and Lorenz on June (or perhaps July) 20, 2016, Williams said that he did not understand how Vitello's jagged rate curve could be derived from one experiment and suggested instead using a simpler model with fewer parameters. *Id.* at 256:16–258:3. Vitello provided a "meandering monologue" in response that made no sense to Williams. 258:4–259:10. Vitello became angry, and argued with Lorenz about the appropriate program to use for the model. *Id.* at 260:11–265:25. Williams testified that during this meeting, he probably made clear that he believed it was unscientific and dishonest not to present the underlying rate curve with Vitello's work, but may not have used the word "dishonest" specifically. *Id.* at 302:23–304:22.

When asked about other colleagues he had raised concerns to before the meeting with Vitello and Lorenz, Williams only specifically remembered making comments similar to what he had told Lorenz to one other scientist, who had an office next to him, and stated that he may have had similar conversations with others but was not sure. *Id.* at 246:22–256:15.

In late 2016 or early 2017, Williams raised concerns about Dr. Vitello's work with his supervisor Dr. B.I. Jun in one or more meetings in Williams's office. *Id.* at 270:3–11, 271:11–272:7. Jun was dismissive of those concerns. *Id.* at 272:21–273:1.

In 2017, Williams raised similar concerns in a presentation he gave to Vitello and others, at the urging of Jun, in an effort to keep his job. *Id.* at 280:2–281:17. One slide of that presentation included Vitello's rate curve, and Williams characterized it as unsuitable for modeling high-explosive corner-turning behavior, stating that LLNS should instead use something "more sensible" and conducive to systematic study. *Id.* at 282:14–286:8. Williams did not explicitly characterize the slide to his audience as "exposing" Vitello's work (because he believed that would not be acceptable coming from someone in his relatively junior role), but he believed that his presentation diplomatically conveyed concerns about the reliability and trustworthiness of the model. *Id.* at 284:10–293:20. The presentation went on to propose an alternative model that Williams had developed. *See id.* at 288:14–15. At his deposition, he rejected the characterization

3

that his audience would have understood the presentation as questioning Vitello's honesty. *Id.* at 292:7–18.

Later in 2017, Williams drew the jagged rate curve on a whiteboard and expressed his view "that there wasn't a systematic approach" during a meeting with Dr. David Miller, who by then was one of Williams's supervisors, but Miller was dismissive of his concerns. *Id.* at 304:23–305:12.

Williams testified that in conversations with others at LLNS before he was fired, he never used "terms like 'unlawful' " or "illegal," probably never used the word "fraud," "did not tell anybody that [he] thought that they had made a false certification to the government" (although he "definitely had those concerns"), and never said that he thought Vitello was cheating the government out of funds. *Id.* at 311:4–312:16.

Several LLNS scientists recall Williams discussing his concerns about the merits of Vitello's models, but they state that Williams never accused Vitello of dishonesty, making false statements, engaging in any sort of fraud, or withholding important information about the integrity of his work. Grove Decl. Ex. 5 (Ellison Decl.) ¶ 3; *id.* Ex. 22 (Lorenz Decl.) ¶ 6; *id.* Ex. 28 (Chodash Decl.) ¶ 3; *id.* Ex. 29 (Greene Decl.) ¶ 3; *id.* Ex. 30 (Jun Decl.) ¶ 3; *id.* Ex. 31 (Miller Decl.) ¶ 4; *id.* Ex. 32 (Nitta Decl.) ¶ 3; *id.* Ex. 33 (Pilkington Decl.) ¶ 3; *id.* Ex. 34 (Vitello Decl.) ¶ 3. Lorenz states in his declaration that he worked with Vitello for many years, had scientific disagreements with him, and believed some of his work could have been better (in part due to a tendency to "default to using [an established] model even though it often produced incorrect results"), but that he never saw any indication of fraud by Vitello and did not believe that what Williams told him of Vitello's work could reasonably support suspicion of fraud. *Id.* Ex. 22 (Lorenz Decl.) ¶¶ 7–9.

Williams's performance review for the first year of his employment, ending in January of 2017, praised aspects of his technical capabilities, but stated that he had difficulty balancing his assigned tasks against questioning their underpinnings and that he was making disappointingly slow progress. Grove Decl. Ex. 8. Lorenz states in his declaration that he was pleased with Williams's work but understood that other at LLNS were not. *Id.* Ex. 22 (Lorenz Decl.) ¶ 5. In

4

March of 2017, a senior LLNS scientist informed Williams that a preliminary decision had been made not to convert him from a probationary employee to a permanent employee—an outcome that, if finalized at a formal reassessment in early May, would result in his termination. *Id.* Ex. 10 at 6534. Williams was fired in May of 2017.

In an email to a friend at LLNS soon after he was fired, Williams wrote that he thought the explanation for his firing was "less malice on anybody's part, and more that people (B.I. Jun; Peter Vitello; Clark Souers) don't have basic people skills and/or common sense. So they have been doing the same thing for years and just don't get why they have to explain what the goals and deliverables of your work are." Grove Decl. Ex. 46 at 3190.[2]

In a January 8, 2018 email to the DOI Office of the Inspector General elaborating on a complaint he filed in 2017, Williams wrote:

> The most solid allegation is incompetent or "bad" science or engineering. Regarding that, I have absolutely zero doubt. In addition, I *believe* that the incompetence, to the extent damaging information appears to have been withheld or in any case not voluntarily disclosed, rises to the level of misconduct or at the least malpractice (i.e. negligence resulting in harm), and that I was fired for objecting to it. *I also have suggested the possibility that it rises to the level of fraud, and yet at the same time I am uncomfortable with this word. I do not think that anyone set out with an intent to deceive*, but I also think that the end result of the actions of various people was a lot of money spent on explosives research to develop a predictive model - a model being paid for by DOE and used to provide assurances that the stockpile works as designed - that is complete junk. Since the people doing this work are smart, I don't think that's possible without a significant degree of willful self-deception and a culture that retaliates against people who offer valid constructive criticism. The end result is a lot of money being spent on bad science to make assurances to the public re the nuclear arsenal that are, in the end, not credible. Perhaps that is not "fraud" but it certainly is serious.

Grove Decl. Ex. 2 at 14947–48 (emphasis added). He also stated that he did not report the matter as fraud:

> I did not raise the discourse to the level of calling it malpractice or fraud. I did tell Miller that I found the methodology highly suspect and unscientific. I had numerous conversations with him regarding this. . . . . I made no allegation of fraud or misconduct or malpractice to Pilkington.

---

[2] For ease of reading, this order omits alphabetical prefixes and leading zeros when citing Bates page numbers of exhibits.

5

*Id.* at 14947. And in response to a question of why he believed Vitello and others developed a deficient model, he wrote:

> Good question. The simplest answer is pure incompetence, but that is a bit unsatisfactory because these are all smart people. A more nuanced answer is that there was a disincentive for them to exercise good scientific and engineering practices, and, perhaps for that reason, they insulated themselves from outside criticism. That is why I suggest that the problem goes beyond just ineptitude, because it required a degree of willful ignorance or self-deception.

*Id.*

In May of 2018, Williams told a potential lawyer that he thought a "claim of retaliation is too weak to pursue" and that he was "not interested in pursuing any such whistleblower status right now." Grove Decl. Ex. 1 at 15026.[3]

In a June 14, 2019 email to a lawyer negotiating a settlement for Williams with a different former employer, Williams wrote that he did "not have the stomach for litigation right now" against that employer, but that LLNS "is different" and he was highly motivated to pursue litigation against LLNS. Grove Decl. Ex. 6 at 15765. Later in June, Williams wrote to a reporter that he was "still trying to make sense of it all," but his "working hypothesis for Vitello's motivation to do his bad science" was to ensure continued funding for a team using a particular modeling tool. Grove Decl. Ex. 48 at 1722.

Williams sent a series of emails from September 22, 2019 to October 1, 2019 to another scientist he now describes as a "jilted former romantic interest," Opp'n (dkt. 121) at 14, laying out his view of what he believed to be shoddy science at LLNS. Grove Decl. Ex. 47 at 3614–16. When she asked him to "just pose the question," Williams opened his next email with "Q: is this fraud, or just incompetence? Or something else? Or am I over-reacting?," before going on to lay out his concerns about Vitello's rate curves in more detail." *Id.* at 3613–14.

On May 18, 2020, Williams reached out to a lawyer about potentially suing LLNS for age discrimination, although he acknowledged that the statute of limitations had expired. Grove Decl.

---

[3] Williams apparently waived privilege during discovery and produced a large number of communications with potential lawyers (and in at least one case, a lawyer he had retained) to LLNS. The parties did not raise any dispute to the Court concerning production of these communications.

6

Ex. 15. He did not mention that he attempted to expose fraud or suggest that he was fired for whistleblowing. *Id.*

Williams, pro se, filed his original complaint in this case later that month, asserting a claim under the FCA. *See* Compl. (dkt. 1). The original complaint was vague as to a theory of how Vitello's purportedly flawed model translated to a false claim for government funds. It was not entirely clear whether Williams intended to pursue a qui tam claim or a retaliation claim, and there was some delay while the United States assessed whether to intervene (it ultimately did not) and Williams amended his complaint to pursue only a retaliation claim.

In a July 2020 email to lawyers he was considering retaining, Williams wrote that "although [he was] absolutely confident that a claim was made (request for payment, etc) on the basis of the shoddy work, and was its motivation, establishing that fact is another matter." Grove Decl. Ex. 53 at 15255. Writing again to one of those lawyers in April of 2021, Williams laid out a Department of Energy incentive awards program as "[t]he best evidence [he] could find for a specific claim on funds. *Id.* at 15248. In a July 13, 2021 email to another potential lawyer, Williams wrote:

> I focused on the science aspects, of course, b/c that's what I know. I only began to frame out the legal question of "presentment" or "claim on funds" (I only somewhat understand these terms) after doing enough digging in public documents to discover that LLNL management got bonuses for their supposed compliance with DOE/NNSA reg's. I believe that may be important, and I detailed that a bit in the amended complaint, but it's not in the original complaint.

Grove Decl. Ex. 52 at 16062. In an email to another possible lawyer in August of 2021, Williams wrote that it was understandable that attorneys for the United States "might have come up dry" looking for any particular claim on funds, and that he had only discovered the bonus payment program "a few months ago after lots of digging." Grove Decl. Ex. 54 at 15188.

At some point in 2022, Williams published a video on YouTube explaining that he was pursuing this lawsuit because he was fired by LLNS after exposing shoddy science on a nuclear weapons program, and that he was hoping to obtain legal representation, an expert witness, and financial backing. Grove Decl. Ex. 50. Much of the video explains his understanding of the high-explosives corner-turning modeling program, its relationship to nuclear weapons development,

7

and his belief that Dr. Vitello's work had serious undisclosed flaws. *See id.* Towards the end of the video, he states that he had difficulty understanding why LLNS would use ineffective and inefficient methods instead of simpler and more effective models. *Id.* at 18:06–18:22. He concludes: "It all finally made sense after I was fired and I kind of thought about it a little bit, like, oh, I understand what's going on here is that somebody is trying to get money funneled in a certain place—if they highlight that their particular program works really well, they will get money." *Id.* at 18:22–18:38. At the end of the video, he stated that he would be willing to testify to the contents of the video under oath. *Id.* at 21:48–22:12. He removed the video from YouTube soon after posting it because he decided he did not want it to be public, but aside from some questions of tone and factual corrections not relevant to the outcome of this motion, he testified at his deposition that he stood by what he said in the video. Grove Decl. Ex. 3 (Williams Dep.) at 313:14–318:25.

### B. The Parties' Arguments

LLNS moves for summary judgment on the grounds that Williams was not engaged in conduct protected by the FCA because there is no evidence that he subjectively believed that LLNS was potentially defrauding the government when he raised concerns about Vitello's work, Mot. (dkt. 100) at 25, and because it would not be objectively reasonable for someone in Williams's position to believe that such fraud was occurring, *id.* at 15–24. LLNS argues that Williams did not know how Vitello's research was used or what was disclosed to the government, and that he had no basis for concluding that Vitello's research had any nexus to the amount of government funding that LLNS received. *Id.* at 17–22. It also contends that because, as a matter of law, mere errors or differing opinions as to scientific judgments do not establish the scienter necessary for fraud within the meaning of the FCA, it is objectively unreasonable to conclude that Vitello's work evinces fraud—accepting for the sake of argument Williams's criticism of his methods. *Id.* at 22–24. Moreover, even if Williams could show that he engaged in protected conduct, LLNS argues that there is no evidence that it knew of such conduct when it fired him, since he never told anyone that he believed Vitello was engaged in fraud. *Id.* at 13–15. LLNS notes that Williams engaged in a number of other scientific disagreements with colleagues that he

8

does not suggest arose from fraud. *Id.* at 15.

Williams argues that while he only had a general sense of LLNS's funding and saw small parts of its research, he knew that LLNS's work on the W80-4 weapon was funded by the Department of Energy and believed that Vitello's models were integral to that work. Opp'n at 8–10. He contends that while some degree of calibrating a model to data is appropriate, and the line between that and improper fitting can be difficult to draw with precision, Vitello's work was egregious. *Id.* at 10–11. Williams argues that the other scientific disagreements that LLNS identifies are not comparable to the complaint he raised about Vitello's model. *Id.* at 11–13. He notes that the actual reasons for his termination are beyond the scope of this phase of the case. *Id.* at 13.[4] He contends that he genuinely believes LLNS "is violating the public trust by performing shoddy nuclear weapons work," thus putting lives at risk, and that his "theory of fraud [having] evolved over time" does not show that he filed suit without a theory of fraud. *Id.* at 13–14. He contends that his work on an alternative to Vitello's model—which took several months—would have put LLNS on notice of the degree to which he objected to Vitello's work, because it was not a normal project for him and instead "outside the bounds of expected behavior." *Id.* at 14, 15–16.

Williams also asserts that he "experienced intimidation, near physical violence, and harassment to such a degree that, especially considering his precarious position" as a probationary employee, it would be unreasonable for him to overtly accuse anyone of fraud or misconduct. *Id.* Without citation to evidence, he contends that his meeting with Vitello and Lorenz was "nearly [a] physical confrontation in a shouting match"; that another senior LLNS scientist told Williams he was "a zero" and the "worst designer" that scientist had ever worked with (for reasons Williams characterizes as "not material" and does not explain); and that Jun became belligerent, visibly enraged, and stormed out of" at least one meeting with Williams. *Id.* at 15. Williams notes that

---

[4] To stave off potentially unnecessary complexities related to classified information, the Court bifurcated the case, with the first phase (culminating in the present motion for summary judgment) limited to: "a. Whether Plaintiff in good faith believed that LLNS was possibly committing fraud against the government[;] b. Whether a reasonable employee in the same or similar circumstances as Plaintiff might have believed that LLNS was possibly committing fraud against the government[;] c. Whether Plaintiff did any lawful acts that were designed to further an action under the [FCA] or to stop one or more violations of the FCA[; and] d. Whether LLNS knew that Plaintiff engaged in the alleged protected activity." Dkt. 85.

the FCA does not require "magical incantations" of specific terminology in raising a complaint, and argues that he sufficiently put LLNS on notice of protected conduct because he "made plainly clear to [LLNS] that he found Dr. Vitello's methods plainly unscientific and that he could not sign his name to them" and refused to simply do what he was told, which would have been typical for someone in his position. *Id.* at 15–16.

In its reply, LLNS contends that there is no legal authority supporting Williams's position that he should be relieved from having to show LLNS's knowledge of protected conduct because he faced a purportedly hostile work environment (for which Williams cites no evidence). Reply (dkt. 130) at 1–2, 5. It contends that there was no basis for anyone at LLNS to believe Williams's criticism of Vitello's model went beyond a disagreement as to its scientific merit, which is not fraud within the meaning of the FCA, particularly in a field where such disagreements are common. *Id.* at 2–3. LLNS argues that Williams's work on an alternative model is not tantamount to reporting fraud. *Id.* at 4. LLNS also argues that Williams cannot show he engaged in protected conduct because a reasonable employee in Williams's position would not have perceived Vitello's work as fraud against the government, *id.* at 5–10, and because Williams has identified no evidence that subjectively believed that before he was fired, *id.* at 10–11.

### III.  ANALYSIS

####   A.  Legal Standard for Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'" *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record

. . . ."). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). Thus, it is not the task of the court "'to scour the record in search of a genuine issue of triable fact.'" *Id.* (citation omitted); *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

"[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Neither conclusory, speculative testimony in declarations nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B. Williams Has Not Shown False Claims Act Retaliation

In addition to its qui tam provision allowing relators to bring claims to remedy actual fraud against the government, the FCA also prohibits retaliation against employees who attempt to report or thwart such fraud. Only that anti-retaliation provision is currently at issue in this case. "An employee must prove three elements in a [31 U.S.C.] § 3730(h) retaliation claim: (1) that the employee engaged in activity protected under the statute; (2) that the employer knew that the employee engaged in protected activity; and (3) that the employer discriminated against the employee because she engaged in protected activity." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab'y*, 275 F.3d 838, 845 (9th Cir. 2002).

11

Protected activity is defined as "lawful acts done . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C.A. § 3730(h)(1). "[A]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore*, 275 F.3d at 845. " '[S]pecific awareness of the FCA is not required,' but 'the plaintiff must be investigating matters which are calculated, or reasonably could lead, to a viable FCA action.' " *Id.* (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)).

The Ninth Circuit has cautioned that mistakes, negligence, and scientific errors are not "fraud" within the meaning of the FCA:

> Wang's case betrays a serious misunderstanding of the Act's purpose. The weakest account of the Act's requisite intent is the knowing presentation of what is known to be false. The phrase "known to be false" in that sentence does not mean "scientifically untrue"; it means "a lie." The Act is concerned with ferreting out "wrongdoing," not scientific errors. What is false as a matter of science is not, by that very fact, wrong as a matter of morals. The Act would not put either Ptolemy or Copernicus on trial.

*Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) (cleaned up), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015) (en banc). Addressing the particular instances of purported misconduct on which the plaintiff relied, the Ninth Circuit held that "[b]ad math is no fraud," "[p]roof of one's mistakes or inabilities is not evidence that one is a cheat," and "[w]ithout more, the common failings of engineers and other scientists are not culpable under the Act." *Id.* at 1420–21.

Here, Williams cannot show that he engaged in protected activity because there is no evidence that he actually believed at the time of the activity in question—i.e., before he was fired—that LLNS was potentially defrauding the government. Even if he could, there is no evidence that anyone at LLNS knew he was attempting to report or avert fraud.

### 1. Williams Has Not Shown Protected Activity

In *Moore*, two employees of the Jet Propulsion Laboratory ("JPL") concluded that gears in an antenna that JPL was manufacturing for NASA were defective and recommended replacing

12

them, and another employee "approved a lien on the transfer of the antenna which also indicated that the gears needed to be replaced." 275 F.3d at 846. The contract for the antenna included a significant discretionary incentive award. *Id.* On the same day that JPL circulated an internal memo that "stressed the importance of prompt delivery to make a good impression on NASA," the employee who had previously approved the lien sent "the outside contractor responsible for releasing the lien[] a memo stating that there was no problem with the structural integrity of the gears and no need to replace them in the foreseeable future." *Id.* The outside contractor requested a report authored by one of the employees who originally concluded the gears needed to be replaced, and JPL sent a copy of the report omitting the pages that recommended replacing the gears. *Id.* The other employee who had originally recommended replacing the gears called the NASA Inspector General's office and reported that he "suspected fraud at JPL," and later brought a retaliation claim under the FCA. *Id.*

       The district court granted summary judgment for the defense on the basis that the employee did not engage in protected activity because the memo to the outside contractor denying problems with the gears was not "directly related to" a payment by the government. *Id.* The Ninth Circuit reversed, holding that a jury could conclude the employee "believed in good faith" that the memo had been a lie intended "to speed up the release of the lien on the antenna and ensure delivery of the antenna to NASA as scheduled, and, as a result, increase the amount of the discretionary Incentive Award NASA would pay to JPL," and could also conclude that "that a reasonable employee in the same or similar circumstances might believe" the same. *Id.*

       On the other hand, courts have held that where employees are motivated by concerns other than investigating fraud against the government, they do not engage in conduct protected by the FCA. Reversing a jury verdict in favor of a teacher who raised concerns about misconduct by a school district that received federal funds for special education programs, the Ninth Circuit wrote:

> The entire record fails to demonstrate Hopper was engaged in "furtherance of an action" under the FCA. Rather, the record quite clearly shows Hopper was merely attempting to get the School District to comply with Federal and State regulations. Her numerous written complaints, seventy letters and over fifty telephone calls were all directed toward this end. She was not trying to recover money for the government; she was attempting to get classroom teachers into

13

> IEP evaluation sessions. She was not investigating fraud. She was not whistleblowing as envisioned in the paradigm qui tam FCA action. *United States ex rel. Fine v. Chevron, U.S.A., Inc.*, 72 F.3d 740, 742 (9th Cir.1995) (en banc), *cert. denied*, 517 U.S. 1233, 116 S.Ct. 1877, 135 L.Ed.2d 173 (1996). Quite plainly, the thrust of her complaints was that the School District was failing to meet its IDEA obligations to its students. Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct.

*Hopper*, 91 F.3d at 1269.

In *Boyd v. Accuray, Inc.*, a district court relied on *Hopper* to grant summary judgment for the defendant where "the record quite clearly shows that Plaintiff was merely attempting to get Accuray to comply with FDA's 'traceability' regulatory requirement and was concerned about patient safety, not fraud against the U.S. government." 873 F. Supp. 2d 1156, 1164 (N.D. Cal. 2012) (Koh, J.), *aff'd*, 593 F. App'x 647 (9th Cir. 2015). The *Boyd* court rejected the plaintiff's "self-serving declaration in support of his opposition" presenting a theory that the regulatory violations at issue enabled customs fraud, finding that it was a sham in light of contemporaneous evidence that the plaintiff's motives lay elsewhere and his own sworn testimony that he "could not explain how any of the events that transpired . . . resulted in the U.S. government getting any less money." *Id.* at 1164–65; *see also United States ex rel. Lockyer v. Hawaii Pac. Health*, 490 F. Supp. 2d 1062, 1083–84 (D. Haw. 2007) (granting summary judgment where the record made clear the plaintiff was investigating discrepancies in his own pay, not fraud on the government, despite his declaration to the contrary), *aff'd*, 343 F. App'x 279 (9th Cir. 2009).

This case does not resemble *Moore*, where: (1) the contract at issue included a significant discretionary component to be determined by the government agency; (2) the plaintiff had recently received a memo stressing the importance of prompt completion and minimizing lien-related delays in order to make a good impression on that agency; and (3) the plaintiff specifically reported that he "suspected fraud" in lifting a lien. *See* 275 F.3d at 846. Instead, it is more like *Hopper*, *Boyd*, and *Lockyer*, where plaintiffs lodged complaints or started investigations for other reasons, and only developed theories of fraud against the government after they experienced the conduct they alleged to be retaliatory.

By his own admission, Williams never told anyone that he suspected fraud before he was

fired. Grove Decl. Ex. 3 (Williams Dep.) at 311:4–312:16. No one to whom he raised concerns while employed at LLNS remembers him alleging fraud or similar misconduct. Grove Decl. Exs. 5, 22, 28–34. Evidence from after he was fired suggests an evolving theory of motive, beginning with concerns of bad science and willful blindness after he was fired in 2017 and 2018, *id.* Ex. 2 at 14947–48, developing to a vague hypothesis in mid-2019 that Vitello was motivated by funding, *id.* Ex. 48 at 1722, then to questions later that year as to whether Vitello's work was fraudulent, *id.* Ex. 47 at 3613–14, to being "absolutely confident" in July of 2020 that some as-yet-undetermined claim for funds motivated Vitello's shoddy work, *id.* Ex. 53 at 15255, and ultimately ending with identifying a Department of Energy incentive program as the government funding mechanism on which to hang his claim in 2021, *e.g.*, *id.* Ex. 54 at 15188.

This evidenced alone might well be enough to warrant summary judgment on the element of Williams's subjective belief. Moreover, unlike in *Boyd* and *Lockyer*, Williams has not even offered a declaration that he believed Vitello was engaged in defrauding the government when he raised concerns about his model. His declaration makes clear that he believed Vitello's work was unscientific, and that it was important. *See generally* Williams Decl. But that is not the same as fraud. *See Wang*, 975 F.2d at 1421. He asserts in his opposition brief that he "suspected fraud from mid-2016," Opp'n at 14, but "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

The only evidence that comes close to suggesting that Williams was concerned about LLNS defrauding the government before he was fired is a passing statement in his deposition, when asked if he ever told anyone that he "thought that Lawrence Livermore had made a false certification or a false statement to the government," that he "definitely had those concerns" but did not tell anyone about them. Grove Decl. Ex. 3 (Williams Dep.) at 312:4–11. Neither party addresses that testimony in their briefs. The FCA prohibits false statements *for the purpose of defrauding the government out of money*, rather than making false statements at all, and Williams's comment that he harbored undisclosed concerns about false statements stops short of asserting that he suspected fraud as to government funding.

15

To the extent there is any question of what Williams meant by that deposition testimony, his YouTube video—the overall accuracy of which he reaffirmed at his deposition, *id.* at 318:6–25—makes clear that a potential motive of Vitello or others at LLNS to obtain funding only occurred to Williams after he lost his job. Grove Decl. Ex. 50 at 18:22–18:38 ("It all finally made sense after I was fired . . . that somebody is trying to get money funneled in a certain place . . . ."). Despite LLNS relying on that video in its motion, Williams does not address it in his opposition brief.

Taking together Williams's video statement that a funding motive only occurred to him after he was fired, evidence suggesting that he developed his present theory of fraud in the years afterwards, and the lack of any declaration or other evidence that he was concerned about fraudulent claims for government funds when he worked at LLNS, no reasonable jury could find that Williams's complaints about Vitello's work were intended to deter or uncover a fraudulent claim within the meaning of the FCA.

Other potential motives Williams may have harbored—whether standing up for his own work, championing the integrity of science for its own sake, or pursuing an effective nuclear deterrent for national defense—might well be laudable, but Williams has asserted his claim under the FCA, and he has not produced evidence that he engaged in the sort of conducted protected by that statute. *See Hopper*, 91 F.3d at 1269 ("Correcting regulatory problems may be a laudable goal, but one not actionable under the FCA in the absence of actual fraudulent conduct."). Because Williams cannot show on this record that he subjectively believed he was reporting a fraudulent claim for government funds, LLNS is entitled to summary judgment on Williams's sole claim for retaliation in violation of the FCA. The Court does not reach the parties' arguments regarding the objective prong of the test for protected conduct.

### 2. Williams Has Not Shown LLNS's Knowledge

Even if Williams could show that he harbored a belief that LLNS was engaged in some sort of fraud on the government at the time he was challenging Vitello's work, there is no evidence that anyone at LLNS knew that Williams held such a belief or understood his conduct as an effort to challenge such fraud.

A "whistleblower must show the employer had knowledge the employee engaged in 'protected activity,' " because "unless the employer is aware that the employee is investigating fraud, the employer could not possess the retaliatory intent necessary to establish a violation of § 3730(h)." *Hopper*, 91 F.3d at 1269. "[W]hen an employee voices complaints but does not refer to any allegations of fraudulent conduct against the government, the employer lacks the requisite knowledge to make out a FCA retaliation claim." *Lockyer*, 490 F. Supp. 2d at 1085. Even where a defendant "may have engaged in retaliation for [the plaintiff's] activities," that does not violate the FCA if the defendant had no reason to believe the activities at issue were connected to that statute. *Hopper*, 91 F.3d at 1270.

The Court is aware of no authority supporting Williams's contention that he should be held to a lower burden as to this element because he reasonably feared retaliation. The issue here is not the reasonableness of Williams's conduct, but whether LLNS knew he was investigating potential fraud on the government. Of course, if there were other evidence that anyone at LLNS believed that was his goal, Williams could satisfy this element even if he did not explicitly disclose such a purpose. But the record contains no such evidence; to the contrary, every relevant LLNS employee states that they did not understand Williams to be accusing Vitello of fraud or otherwise suggesting fraud against the government. Grove Decl. Exs. 5, 22, 28–34. Williams must therefore present evidence from which it is reasonable to infer, despite those denials, that someone at LLNS knew he was pursuing a potential FCA violation.

Typically, such evidence would show that a plaintiff told the defendant what the plaintiff was doing. *See Lockyer*, 490 F. Supp. 2d at 1085. It is not unusual that a plaintiff might fear repercussions from accusing their employer of fraud, but that is the very purpose of the FCA's anti-retaliation provision—to protect employees from such consequences. To fall within that protection, a whistleblower generally must blow their whistle loud enough for their employer to hear it. If they do not, and there is no other evidence showing that the employer believed the employee was pursuing an FCA claim or attempting to prevent an FCA violation, then the employee cannot show that any subsequent adverse action was retaliation for activity protected by that statute. *See Hopper*, 91 F.3d at 1269.

By Williams's own admission, he never overtly accused anyone of fraud against the government or suggested that such fraud was occurring during the time he worked for LLNS. *See* Grove Decl. Ex. 3 (Williams Dep.) at 311:4–312:16. He attempted to frame his concerns about Vitello's work diplomatically, rather than risk his job by leveling explosive accusations at a more senior scientist. *See, e.g.*, *id.* at 288:22–289:15. Williams is correct that he is not required to "know the particulars of an FCA action or *qui tam* possibility or use appropriate language when internally reporting wrongdoing," but even the case on which he relies for that proposition makes clear that he still "must set forth some connection to fraudulent or false claims against the federal government" in order to support an inference that LLNS retaliated for his investigation of such fraud. *McKenzie v. BellSouth Telecommunications, Inc.*, 219 F.3d 508, 518 (6th Cir. 2000); *see* Opp'n at 15. Merely expressing disagreement—even profound disagreement—with the merits of a colleague's work would not put others at LLNS on notice that Williams believed anyone there was potentially defrauding the government. *See, e.g.*, Grove Decl. Ex. 22 (Lorenz Decl.) ¶¶ 7–8 (stating that Lorenz shared Williams's concerns about the merits of Vitello's model but did not consider those deficiencies to suggest fraud or dishonesty); *id.* Ex. 31 (Miller Decl.) ¶ 3 ("This was not unusual—debate between the scientists about the various aspects, merits and shortcomings of the models is a daily activity . . . ."). "Proof of one's mistakes or inabilities is not evidence that one is a cheat." *Wang*, 975 F.2d at 1420.

Williams suggests that because his extensive efforts to develop an alternative model went beyond his assignments and LLNS's expectations for his work, LLNS would have inferred that he believed Vitello's model was fraudulent. He relies on caselaw holding that where an employee's investigative efforts fall within the normal duties of their job, those efforts are not protected conduct or the employer lacks the necessary knowledge that the employee was pursuing an FCA claim. Opp'n at 15–16 (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948 (5th Cir. 1994)). But that proposition does not support the converse, that any efforts outside of an employee's normal work would give rise to an inference that the employee suspected fraud. As LLNS notes in its reply, "knowing that someone thinks he can come up with a better, scientifically sound model is not the same thing as knowing that the person is trying to avert a fraud," and

18

Williams "gave LLNS no reason to think that he was trying to avoid a *fraud* by not doing his job and working on something else instead." Reply at 4.

Accordingly, as a separate and sufficient reason beyond Williams's failure to present evidence of his own contemporaneous belief that LLNS was perpetrating fraud on the government, LLNS is entitled to summary judgment because there is no evidence that it knew Williams was engaged in protected conduct.

## IV. CONCLUSION

For the reasons discussed above, LLNS's motion for summary judgment is GRANTED. The Court does not reach the parties' arguments as to what a reasonable employee in Williams's position would have believed, and has no occasion to resolve other issues such as the merits of Vitello's model or the reason Williams was fired.

The Clerk shall enter judgment in favor of LLNS and close the case.

**IT IS SO ORDERED.**

Dated: January 2, 2023

JOSEPH C. SPERO
Chief Magistrate Judge